HANKINS, et al. *v.* HARVEY, et al.

No. 42753 February 3, 1964 160 So. 2d 63

640

*Ethridge, Minniece & Bourdeaux,* Meridian, for appellants.

*Snow, Covington, Shows & Watts,* Meridian, for appellees.

KYLE, P. J.

The appellants, Mrs. Prima Vista Hankins, Mrs. Carl McKinney, Jr., and Lawson A. Hankins, Jr., surviving widow and children of Dr. Lawson A. Hankins, Sr., deceased, filed suit in the Circuit Court of Lauderdale County against Hence Harvey and Lauderdale County Co-Operative, a co-operative marketing association organized and existing under the laws of the State of Mississippi, as defendants, for the recovery of damages for the wrongful death of Dr. Hankins who was killed in an automobile accident which occurred on January 4, 1962.

The record shows that Dr. Hankins and his wife had left their home in Baytown, Texas, a few days before Christmas, 1961, to visit their son and his family in Taccoa, Georgia, and they were returning to their home in Baytown at the time of the accident. The automobile in which Dr. Hankins and his wife were riding was a 1961 Star Chief Pontiac, which was owned by Mrs. Hankins who was driving the car at the time of the accident. Mrs. Hankins was 71 years of age, and Dr. Hankins was 82 years of age. Dr. Hankins had suffered a heart attack sometime prior to 1960 and had retired from the practice of medicine. He had also sold his interest in a hospital which he had operated in Baytown for many years. Dr. Hankins and his wife left Taccoa about 8:30 A.M. on January 3 and arrived at the Holiday Inn at Meridian about nightfall. The distance from Meridian to Baytown, Texas, was approximately 500 miles, and after a few hours rest at the motor court the couple resumed their trip homeward about 3:00 A. M. on January 4. They stopped at a gasoline service station in the City of Meridian to have their car serviced, and were advised by the service station operator to drive southwardly along U. S. Highway No. 11, which was a two-lane truck-line highway with hardtop surface, to New Orleans. The accident occurred about an hour later

on Highway No. 11 about three miles south of the Town of Enterprise, in Clarke County, Mississippi, when the automobile in which Mrs. Hankins and Dr. Hankins were riding collided with a truck which was owned by the defendant Lauderdale County Co-operative and was being operated by the defendant Hence Harvey. The truck had become disabled as a result of motor trouble and was parked on the west or southbound traffic lane of the highway at the time of the collision.

The plaintiffs alleged in their declaration that Dr. Hankins was killed as a result of the wrongful acts and negligence of Hence Harvey, while acting as the servant and employee of the defendant Lauderdale County Co-operative, and while he was about his master's business; that Hence Harvey, in violation of duties owed by him to the deceased and the general public, negligently, carelessly and unlawfully operated or caused to be operated on the above mentioned highway a large truck which was known or by the exercise of reasonable care should have been known to be not in good operating condition, and which was liable to break down and stop on the public highway; that Hence Harvey carelessly and unlawfully stopped his vehicle on the main traveled portion of said highway at a time when it was practical to drive said vehicle off the highway and onto the shoulder thereof; that by parking said vehicle on the main traveled portion of the highway the defendants created a dangerous trap for other motorists lawfully using the highway, the terrain and contour of the highway being such that lights from vehicles approaching the standing truck would not illuminate the same or permit the same to be seen; and that the defendants failed to place flares, fusees and reflectors, or other signals, to the rear and in advance of the truck and upon the roadway side of the truck, as required by law.

In their answer the defendants admitted that Hence Harvey was acting for Lauderdale County Co-operative

at the time the truck came to a stop on the traveled portion of the highway and at the time the collision occurred. The defendants, however, denied specifically the several acts of negligence alleged in the plaintiffs' declaration. The defendants averred in their answer that they did not know prior to the accident complained of that their truck trailer unit had any defect therein, and that up to the time the vehicle became disabled they considered the same roadworthy and without defect; that without fault or negligence on the part of either of the defendants the motor of the truck suddenly and without warning stopped at a time when the truck trailer unit was proceeding up a hill; that there was on the trailer a heavy load, which required motor power to move it, and the truck trailer unit could not be moved so long as the motor of the truck could not be run; that the highway ran uphill at the point where the motor became disabled, and the highway did not have sufficient shoulders to permit a loaded truck trailer unit to be pulled off the pavement and stopped on the shoulders. The defendants further averred that the truck trailer unit was equipped with fusees and had reflectors and electric lights thereon; and that immediately after trouble developed Harvey set the brakes on his truck and took flares and reflectors in hand and was proceeding to place them on the highway when the accident occurred. The defendants denied that it was practical or possible for Harvey to drive the truck trailer unit off the highway at the place where it was stalled or to move it onto the shoulder.

By way of defensive matter the defendants averred that the plaintiff, Mrs. Hankins, was driving at a high and dangerous rate of speed and failed to keep the automobile which she was driving under proper control; that she had driven around a curve at a high rate of speed and without keeping a proper lookout for other vehicles on the highway, and failed to see the defendants' truck

trailer unit and the flares which had been placed on the highway; and that she failed to reduce her speed or apply her brakes. The defendants denied that any negligence on their part contributed to the accident complained of.

The case was tried at the October 1962 term of the court, and the jury returned a verdict for the defendants. The court overruled the plaintiffs' motion for a new trial, and from the judgment entered in favor of the defendants the plaintiffs have prosecuted this appeal.

The appellants have assigned and argued five points as grounds for reversal of the judgment of the lower court: (1) That the verdict of the jury was contrary to the overwhelming weight of the evidence; (2) that the court erred in granting the appellees' instructions which appear on pages 476 and 477 of the record; (3) that the court erred in refusing to grant the appellants' requested instruction which appears on page 457 of the record, and in granting the appellees' instruction which appears on page 475 of the record; (4) that the court erred in granting the appellees' instruction which appears on page 465 of the record; and (5) that the court erred in granting the appellees' instructions which appear on pages 469 and 470 of the record.

For a proper understanding of the errors assigned and argued as grounds for reversal of the judgment, it is necessary that we give a brief summary of the testimony offered on behalf of the respective parties.

The plaintiff, Mrs. Prima Vista Hankins, testified that the wreck occurred about 4:00 A.M.; that she was driving at a rate of speed of 50 to 55 miles per hour; that the road was full of curves, and she was not accustomed to driving in curves. She stated that she made one curve that looked "pretty bad." She went on to the next curve "and it got steeper." She followed the road and came upon the truck obstructing the highway in her lane of travel. When she saw the truck, she was right

on it. She attempted to turn her car to the left, but she was unable to avoid a head-on collision. The lamps on her car were lighted at the time of the collision. She did not see a man in the roadway waiving a flashlight, and she did not see the truck driver after the collision occurred. She was unable to get out of her car because of her injuries. Dr. Hankins had no pulse. The ambulance came after a long time, and the highway patrolman came, but no one else stopped at the scene of the accident so far as she knew. Both of her ankles were broken and one leg was broken, and she suffered other injuries. On cross-examination Mrs. Hankins stated that she did not know whether she had her bright lights or her dim lights burning just before the accident. She did not look at her speedometer any time after she left Meridian. She stated that, when she first saw the truck, she realized that she could not get around it. So far as she knew the lights on her car were burning when it ran into the rear end of the truck. She saw no marker lights or reflectors of any kind on the truck.

Hence Harvey, who was first called to testify as an adverse witness by the plaintiffs, and was later recalled for direct examination by his own attorney, testified that he was 55 years old and had worked for the Lauderdale County Co-operative as a truck driver about 12 years; that the truck which he was driving was a 1957 Chevrolet tractor-trailer combination unit, with the cab over the engine, and had a carrying capacity of 13 tons. Harvey stated that he had driven the truck to Louisiana sometime after December 15, and had picked up a load of salt to be transported back to Meridian; that while on his way to his destination in Louisiana he noticed the lights on his truck were dim, and he stopped at a motor vehicle service station and had his battery charged. After he had the battery charged he had no further trouble on that trip. When he returned to Meridian, he had the battery taken out and a new battery installed,

and he drove the truck to Pascagoula and back a few days later without any trouble developing.

Harvey testified that his truck was loaded with ten tons of cattle feed during the late afternoon and early evening of January 3. The feed was to be transported to Poplarville over U. S. Highway No. 11. He left Meridian at an early hour the following morning. Before leaving he inspected his truck and started the motor, and so far as he could tell, everything was all right, and he experienced no trouble with the motor until he reached a long hill about three miles south of Enterprise. It was a steep hill, and when the truck was at a point approximately opposite the south end of the north guard rail, he noticed that the speed of the truck was declining. He shifted the gear of the truck from high to low, and then to double low, and the truck came to a stop. He attempted to start the motor, but it did not start on the battery. He then atempted to start the motor by engaging the gear and letting the truck roll backward; but the motor did not start when the truck rolled backward. He then changed the gear back to double low and applied his hand brake. Although the motor would not turn over and start by the use of the battery, the lights on his truck continued to burn.

Harvey testified that his truck was equipped with flares and a flashlight, and when he found that the motor of his truck would not start he decided to put out warning signals. He heard a sound which he took to be the sound of a motor vehicle coming from the south and he immediately grabbed his flares and his flashlight and ran toward the south, where he put out a flare to keep the approaching vehicle coming over the crest of the hill and around a curve from running into his truck. After placing the flare near the crest of the hill, he ran back to the truck and placed a flare in the roadway on the left side of the truck. He then ran down the hill toward the north for the purpose of putting out a flare to the

rear of the stalled truck. He had a flashlight with him. He saw the reflection of lights from a vehicle approaching over the hill north of the hill on which the truck had stopped. He flagged the on-coming vehicle, but it came on with unabated speed and ran into the rear end of the standing truck, rolled back and came to rest against the south post of the north guard rail on the west side of the highway. Harvey stated that he went immediately to the Hankins automobile and flashed his flashlight into the automobile. He saw Mrs. Hankins seated in the automobile with her eyes closed and he heard her say, "Oh he's dead."

Robert S. Anderson, an employee of the Co-operative, testified that he was in charge of the loading of the truck on January 3, 1962; that the loading was completed about seven o'clock that night; that no trouble was experienced in starting the motor, which appeared to be in good operating condition. Anderson stated that the truck was equipped with a proper lighting system, including six burning lights and two reflectors on the rear of the truck-trailer.

W. C. Dansby, a highway patrolman, testified that he arrived at the scene of the accident a short time after the accident occurred. The lights on the truck were burning when he arrived at the scene. The stop light on the back of the truck had been broken; also a bracket with three lights on the back end of the truck had been broken, and one of the two reflectors on the back end of the truck had been broken. He directed the driver of the truck to attempt to start the motor, but the motor did not start, and the truck was later removed from the highway with a wrecker. The patrolman was asked, "How wide was the shoulder on the right-hand side going south at or about the place where the accident occurred?" His answer was, "It was approximately 5 feet." The patrolman stated that the terrain of the land extending southwardly from the town of Enter-

prise was rugged and hilly, and there were many curves in the highway. He identified photographs of the scene of the accident which showed the curves immediately north and immediately south of the point on the highway where the disabled truck was parked, and also a deep ravine and two metal guard rails on the west side of the highway.

Henry E. Damon, a civil engineer, identified a plat which he had made at the request of the plaintiffs' attorneys, showing the route and the elevations of the roadway where the accident occurred. Damon testified that the paved portion of the highway was constructed on a dirt fill east of and opposite a ravine which ran westwardly between two hills. The concrete pavement was 20 feet wide. The north guard rail was 128 feet in length. The south guard rail was 269 feet in length. The space between the two spans of guard rails was approximately 200 feet. The highway alongside and between the guard rails ran uphill toward the south. The grade was a steep grade for a primary federal highway. The point where the disabled truck came to a stop on the west side of the main traveled portion of the highway was approximately 74 feet south of the south end of the north guard rail. The shoulder of the highway between the north guard rail and the south guard rail was approximately 5½ to 7 feet in width. The shoulder sloped from the west edge of the concrete pavement to the edge of a road ditch which drained from south to north and empited into the ravine immediately west of the north guard rail.

Several other witnesses were called to testify on behalf of the respective parties. But, in view of the fact that the judgment of the lower court must be reversed and a new trial granted on account of the errors in the instructions, it is not necessary that we undertake to summarize the testimony of those witnesses. Neither is it necessary that we consider at this time the appel-

lants' first assignment of error, in which it is alleged that the verdict of the jury is contrary to the overwhelming weight of the evidence.

The main points assigned and argued by the appellants' attorneys as grounds for reversal of the judgment of the lower court relate to alleged errors in the instructions granted to the appellees and the refusal of the court to grant one or more instructions requested by the appellant.

It is first argued that the court erred in granting the appellees' two instructions which appear on pages 476 and 477 of the record.

In the instruction which appears on page 476 of the record the jury was told that, if they believed from the evidence ''that the driver of defendants' truck acted with reasonable promptness and that it was reasonably apparent to him that the placing of a flare or reflector first in front of the truck would likely prevent a collision, and he so placed it, but the Hankins car ran into the rear of the truck before the driver ever got flares or reflectors placed to the rear and side of the truck, no finding of negligence can be made against the defendants because the driver did not place the first flare or reflector to the rear or to the side of the truck before the collision occurred.''

In the instruction which appears on page 477 of the record, the court instructed the jury for the defendants ''that the duty of the driver of a disabled truck, left temporarily in the highway, to put out flares or reflectors on the highway, one approximately 100 feet to the front of the truck, another approximately 100 feet to its rear and another on the roadway side opposite the truck, requires only that he act with reasonable promptness; and if you believe from the evidence that the driver of defendants' truck acted with reasonable promptness, but after placing a flare or reflector in front of the truck, which was reasonably apparent to him would

likely prevent a collision, the Hankins car ran into the rear of the truck before the driver ever got his flares or reflectors placed to the rear and side of the truck, no finding of negligence can be made against the defendants because no flares or reflectors were at the rear and side of the truck before the collision occurred."

It is argued on behalf of the appellants that both of the above mentioned instructions were erroneous for the reasons, (1) that the law itself requires the placing of a warning flare to the rear of the stalled vehicle first; and (2) that if the law does not require the placing of a warning flare to the rear of the vehicle first, the jury should have been instructed to determine whether or not it was reasonable under the circumstances then existing to place a flare in front of the truck before placing a flare to the rear.

Section 8256, Miss. Code of 1942, Rec., provides in part, as follows:

"(b) Whenever any motor truck or bus is stopped upon the highway except for the purpose of picking up or discharging passengers, or its lighting equipment is disabled during the period when lighted lamps must be displayed on vehicles and such motor truck or bus cannot immediately be removed from the main-traveled portion of a highway outside of a business or residence district, the driver or other person in charge of such vehicle shall cause such flares, fusees, reflectors, or other signals to be lighted or otherwise placed in an operating condition and placed upon the highway, one at a distance of approximately one hundred (100) feet to the rear of the vehicle, one approximately one hundred (100) feet in advance of the vehicle and the third upon the roadway side of the vehicle, except that if the vehicle is transporting inflammables, three (3) electric flares or lanterns must be placed in lieu of such other signals and no burning flares shall be placed adjacent to any such last mentioned vehicle."

In discussing the subject of governmental regulation with respect to the requirement that vehicles be equipped with flares, emergency lights or similar devices, and that such warning be displayed when the vehicle is stopped or stalled upon a highway, the textwriter in 60 C.J.S., 784 and 785, Motor Vehicles, Sec. 335 (d), says:

"The operator of a vehicle within the terms of the regulation must comply therewith, and place flares, emergency lights, or other devices of the kind specified, at the times and places prescribed by the regulation. The driver of the stopped vehicle must not only place the required flares but must also display them continuously during the prescribed time. However, he must be allowed a reasonably sufficient time to enable him to place the prescribed warning signals, and the requirement that the warning signal be put out 'immediately' means only that it be put out with reasonable and proper diligence, or promptly under all the facts and circumstances of the case * * *. The failure to post a warning light has been held not to constitute negligence where the vehicle standing on the highway was clearly visible for a sufficient distance to permit approaching vehicles to avoid injury. These regulations were not intended to establish absolute liability regardless of fault, and a violation may be justified on the ground of an emergency not attributable to the operator, or excused by reason of impossibility of compliance due to circumstances beyond his control, as where he did not have sufficient time to comply therewith * * *."

 █ It is the opinion of all of the judges that both of the above mentioned instructions were erroneous for the reason that the proper tests as to the defendant driver's negligence was not whether he did what "it was reasonably apparent to him that he should do", but whether he exercised that degree of care and caution which an ordinarily careful and prudent person would exercise under the same or similar circumstances. 7 Am.

Jur. 2d 898, Automobiles and Highway Traffic, Sec. 353, and cases cited.

■■■ It is the opinion of all of the judges, except the writer of this opinion, and the Court so holds, that the statute itself (Code Sec. 8256(b), supra) requires that the driver or other person in charge of such vehicle, under such circumstances, shall first place a flare to the rear of the vehicle thus stopped upon the highway, at a distance of approximately 100 feet to the rear of the vehicle, and shall then place a flare approximately 100 feet in advance of the vehicle, and the third upon the roadway side of the vehicle, in the order mentioned in the statute. It is the writer's opinion that the statute does not prescribe an ironclad rule fixing the order in which flares should be placed to the rear and in front of a disabled vehicle; and that the issue whether or not the driver of the truck acted with reasonable promptness in placing the flares, and exercised that degree of care and caution which an ordinarily careful and prudent person would have exercised under the same or similar circumstances, was an issue of fact to be determined by the jury under proper instructions of the court. 8 Am. Jur. 2d 388, Automobiles and Highway Traffic, Sec. 830; Harsha v. Bowles (1943), 314 Mass. 738, 51 N.E. 2d 454; Hayungs v. Faulk (1947), 238 Iowa 285, 27 N.W. 2d 15; Caperton v. Mast (1948), 85 Cal. App. 2d 157, 192 P. 2d 467; Sample v. Spencer (1943), 222 N.C. 580, 24 S.E. 2d 241.

It is next argued that the lower court erred in refusing to grant the appellants' requested instruction which appears on page 457 of the record, and in granting the appellees' instruction which appears on page 475 of the record. The refused instruction which appears on page 457 is as follows: "The court instructs the jury for the plaintiffs that if you believe from a preponderance of the evidence in this case that the driver of the truck and trailer could have moved all or any

part of the truck trailer off the travelled part of the highway onto the shoulder before the accident, then the defendants were guilty of negligence, and if you further believe from a preponderance of the evidence that such evidence, if any, proximately caused or contributed to the accident complained of, then it shall be your sworn duty to return a verdict for the plaintiffs.''

The instruction granted to the appellees which appears on page 475 of the record is as follows: ''The court instructs the jury for the defendants that, if the motor of defendants' truck stopped while going up the hill, and the driver made reasonable efforts to start it again without success, and it was reasonably apparent to him, because of darkness or the condition of the shoulder, that he could not safely back the truck off the paved portion of the highway, and that under the circumstances, it was not reasonably feasible or possible to move the truck off the pavement, then it was lawful for the driver to leave the truck in its position temporarily, provided he promptly proceeded to put out flares or reflectors on the highway, one approximately 100 feet to the front of the truck, another approximately 100 feet to its rear and another upon the roadway side opposite the truck.''

The two instructions are based upon Section 8215, Miss. Code of 1942, Rec., which provides as follows:

''(a) Upon any highway outside of a business or residence district no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main-traveled part of the highway when it is practical to stop, park, or so leave such vehicle off such part of said highway, but in every event a clear and unobstructed width of at least twenty feet of such part of the highway opposite such standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicle

be available from a distance of two hundred feet in each direction upon such highway.

"(b) This section shall not apply to the driver of any vehicle which is disabled while on the paved or improved main-traveled portion of a highway in such manner and to such extent that it is impossible to avoid stopping and temporarily leaving such disabled vehicle in such position."

██ ██ We think there was no error in the court's refusal to grant the appellants' requested instruction which appears on page 457 of the record. The instruction in the form requested would have been misleading to the jury.

Paragraph (a) of Code Section 8215 makes it unlawful for any person to stop, park or leave standing any vehicle, whether attended or unattended, upon a paved or improved or main-traveled part of the highway *when it is practical to stop, park or so leave such vehicle off such part of said highway*. Paragraph (b) of the Code Section provides that the section shall not apply to the driver of any vehicle which is disabled while on the main-traveled portion of the highway in such manner that it is *impossible* to avoid stopping and temporarily leaving such disabled vehicle in such position. The two paragraphs should be construed together so as to give effect to their true meaning.

██ ██ The word "impossible" as used in paragraph (b), should not be given a literal construction. The word should be construed as "not reasonably practical." Blashfield's Cyclopedia of Automobile Law and Practice, Vol 2A, Perm. Ed. pp. 18, 19, 20, Sec. 1192; Weir v. Caffery, 247 Wis. 70, 18 N.W. 2d 327; Capital Motor Lines v. Gillette, 235 Ala. 157, 177 So. 881; Boger v. Kellner, 239 Iowa, 1189, 33 N.W. 2d 369.

The evidence in the case that we have before us shows that the highway at the point where the disabled truck came to a stop ran uphill toward the south. The west

shoulder between the two guardrails sloped from the edge of the concrete pavement toward a road ditch which emptied into a deep ravine immediately west of the north guardrail. There was also testimony which indicated that the shoulders of the highway at the point where the truck came to a stop were wet as a result of the winter rains, and in an unfit condition to support the weight of the truck with its 10-ton cargo of cattle feed. Under these circumstances the question of fact for the jury's determination was not whether the truck *could* have been moved, but whether or not it was *reasonably practical* for the driver of the truck to move all or any part of the truck off the traveled portion of the highway onto the shoulder before the accident occurred.

The instruction which appears on page 475 should not have been granted in the form requested, for the reason that the test, as to whether the driver of the truck was justified in leaving the disabled truck in the position that it was left in, was not whether "it was reasonably apparent to him" that he could not safely back the truck off the paved portion of the highway, but whether in leaving the disabled truck in the position that it was left in he exercised such care as a reasonably prudent and capable driver would have exercised under the circumstances. It should also be noted that the clause in the instruction relating to the placing of the flares does not conform to the holding of this Court, stated above, that the flares be placed first to the rear, and then in advance of the vehicle, in the order mentioned in Code Section 8256 (b), supra.

It is next argued that the court erred in granting the appellees two instructions which appear on pages 469 and 470 of the record. The instruction which appears on page 469 undertakes to summarize the requirement for composite beam road lighting equipment prescribed in Section 8229-11 (a), Miss. Code of 1942, Rec.; and in the instruction the jury was told that if the plaintiff

failed to have her car equipped with an upper headlight beam which would reveal persons and vehicles at least 350 feet ahead, and to drive at a speed which would enable her to maintain control of the car and to stop if necessary within the range of her headlights, she was guilty of negligence, and if the jury believed from the evidence that such negligence, if any, was the sole proximate cause of the collision and the death of the deceased, it was their duty to find for the defendants.

The instruction which appears on page 470 of the record is as follows: ''The court instructs the jury that Mrs. Hankins, while driving her automobile at nighttime and at a time when it was dark, was required by law to have two headlights on the front of her automobile burning, and was presumed to see persons and vehicles on the paved portion of the highway ahead of her automobile, within 350 feet thereof, and if she failed to keep such lookout as would enable her to see persons and vehicles on the paved portion of the highway at least 350 feet before she reached it, she was guilty of negligence, and if such negligence, if any, was the sole proximate cause of the accident and death of Mr. Hankins, your verdict should be for defendants and you should make no award of damages to plaintiffs.''

 █ The first of the two instructions failed to state the requirements of the statute in the language of the statute, but the error complained of in that instruction is not sufficient to require a reversal of the judgment of the lower court. █ But in the second instruction, which stated that Mrs. Hankins was presumed to see persons and vehicles on the paved part of the highway ahead of her automobile, within 350 feet thereof, the court in effect held as a matter of law that Mrs. Hankins was guilty of negligence if she failed to see the truck at least 350 feet away; and that instruction should not have been granted in the form requested.

In Jester v. Bailey, 239 Miss. 384, 123 So. 2d 442, the Court said: ''The common-law rule that the operator of a motor vehicle must drive at such a speed as to be able to stop or control the vehicle within the range of his vision is not an inflexible one, and is not invariably applicable, but is subject to exceptions and limitations. They are grounded on the doctrine that, under all of the circumstances of the particular case, the exercise of ordinary care would not necessarily have prevented the accident. 1 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. Ed. 1948), Sec. 751; Planter's Wholesale Grocery v. Kincade, supra. The range-of-vision rule is not an arbitrary rule of thumb to require 'infallibility of the nocturnal motorist.' The motorist must keep his car under such control that he can stop within the clear and unobstructed distance ahead of him, but in determining whether he should be held responsible, the character, appearance, and visibility of unlighted vehicles parked on the road must be taken into consideration. 1 Blashfield, ibid., Sec. 751; Thomas v. Thurston Motor Line, 230 N.C. 122, 52 S.E. 2d 377, 383 (1949); Carter v. LaBlanc Lumber Co., 37 So. 2d 471, 476 (La. 1948); see also 1 Blashfield, ibid, Sec. 752, (statutory rule of 'assured clear distance ahead.').''

Finally, it is argued that the court erred in granting to the appellees the following instruction, which appears on page 465 of the record:

''The court instructs the jury for defendants that even if you should find that defendants were guilty of some negligence, still you cannot render a verdict against defendants unless plaintiffs have proved to you by a preponderance of the evidence there was a causal connection between the negligence of the defendants and the accident complained of.

''If you believe from the evidence Mrs. Hankins was guilty of negligence in the driving of her automobile, as negligence is defined in the other instruction, and

that without the negligence of Mrs. Hankins the accident would not have occurred, your verdict should be for defendants.''

██ ■ In the last paragraph of that instruction the court told the jury in effect that, if the accident in question resulted from the concurrent negligence of Mrs. Hankins and the truck driver, the defendants were entitled to a verdict. Such is not the law. ██ ■ This Court has repeatedly held that there may be more than one proximate cause of an injury. Cumberland Tel. and Tel. Co. v. Woodham, 99 Miss. 318, 54 So. 890; Solomon v. Continental Baking Co., 172 Miss. 388, 160 So. 732; Brewer v. Town of Lucedale, 189 Miss. 374, 198 So. 42; Gulf Refining Co. v. Brown, 196 Miss. 131, 16 So. 2d 765; Planters Wholesale Grocery v. Kincade, 210 Miss. 712, 50 So. 2d 578; Continental Southern Lines, Inc., v. Klaas, 217 Miss. 795, 827, 65 So. 2d 575.

In Continental Southern Lines, Inc., v. Klaas, supra, the Court said:

''It is next argued by the bus company that, even if it be true that Welch was negligent in the manner in which he brought the bus to a stop, or in failing to maintain a proper lookout, or in failing to give proper warning of his intention to stop, or in bringing his bus to a stop too suddenly, still Welch's negligence was not the proximate cause of the collision, but that the sole proximate cause of the collision was the negligence of Lawyer Partee in driving his truck too fast, and in following too closely behind the seed truck, and in turning his vehicle abruptly into the traffic lane of the oncoming Studebaker.

''But this too was a question that was properly submitted to the jury. And it was not necessary, in order to hold the bus company liable, that the jury should find that the negligence of the bus company was the sole proximate cause of the injury. There may be more than one proximate cause of an accident or injury, and

where there is more than one proximate cause each of the concurrent efficient causes contributing directly to the accident or injury is a proximate cause thereof.''

For the errors in the instructions complained of and noted above, the judgment of the lower court is reversed, and the cause is remanded.

Reversed and remanded.

All Justices concur, except Patterson, J., who took no part.